**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| ARIEL COTES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: _____ |
| | ) | |
| PURE AESTHETICS, LLC, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## PRELIMINARY STATEMENT

Defendant Pure Aesthetics, LLC admittedly failed to include commissions earned by Plaintiff Ariel Cotes in its calculation of the regular rate of pay and refused to compensate Ms. Cotes for work performed off the clock, including fielding requests from clients outside of normal working hours, responding to requests for status updates, and reviewing Slack messages regarding her employment. When she sent a demand letter seeking repayment of these unpaid wages, Pure Aesthetics responded by initiating retaliatory litigation against Ms. Cotes because she broached the subject of Pure Aesthetics' failure to comply with wage laws, all in violation of the Fair Labor Standards Act. This lawsuit for unpaid wages, compensatory and liquidated damages, injunctive relief, and attorney's fees and costs follows.

## THE PARTIES

1.     Plaintiff Ariel Cotes, a Florida resident, is a former employee of Defendant Pure Aesthetics, where she worked for several years as an aesthetician.

2.     Defendant Pure Aesthetics, LLC is a Florida limited liability company with its principal place of business located at 217 NW 76th Drive, Gainesville, Florida 32607.

3.      Pure Aesthetics may be served with process via its registered agent, Carissa Blaser, at its principal place of business.

## JURISDICTION AND VENUE

4.      Plaintiff's claims present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(a).

5.      Pure Aesthetics is subject to general and specific personal jurisdiction in the State of Florida. Upon information and belief, Pure Aesthetics is subject to general personal jurisdiction because at least one of its members is a citizen of Florida. Additionally, Pure Aesthetics is subject to specific personal jurisdiction because this lawsuit arises out of its forum-related contacts in the State of Florida and the actions alleged in the Complaint occurred within this State.

6.      Under 28 U.S.C. § 1391(b), venue is proper because the unlawful practices giving rise to Ms. Cotes' claims occurred in this district and division.

## FACTUAL BACKGROUND

7.      Pure Aesthetics is a medical spa that provides various skincare-related services to its clients, such as laser hair removal, injectable fillers, and other skincare treatments. Pure Aesthetics is based in Gainesville and operates a medical spa treatment center located at 217 NW 76th Drive, Gainesville, Florida 32607.

8.      At all relevant times, Pure Aesthetics was an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

9.      At all relevant times, Ms. Cotes was an employee within the meaning of Section 3(e) of the FLSA, 29 U.S.C. § 203(e).

10.     Medical spas like Pure Aesthetics are primarily staffed by aestheticians. Aestheticians administer the various treatments offered by the medical spa.

11.     Plaintiff Ariel Cotes began working for Pure Aesthetics in June 2021 as a client coordinator. In that role, Ms. Cotes handled front desk duties, including scheduling appointments, ringing up purchases, and serving customers.

12.     Ms. Cotes reported to Allison Walker, Practice Manager, and Carissa Blaser, Pure Aesthetics' owner.

13.     Throughout 2021, Ms. Cotes had been taking classes towards an aesthetician certification. For context, aestheticians perform a range of skin-and-body-care services, including facial treatments, microdermabrasion, and dermaplaning.

14.     After receiving her licensure, Ms. Cotes started training to perform certain aesthetician-related duties with Pure, and also continued her work as a client coordinator.

15.     During her training, Ms. Walker warned Ms. Cotes that Pure Aesthetics forbids its employees from discussing their pay among themselves or with others. Ms. Cotes was further cautioned that anyone heard discussing pay would be subject to immediate termination.

16.     Notably, this prohibition on discussing pay was also mentioned by Ms. Blaser before she hired Ms. Cotes to work at Pure.

17.     On information and belief, this threat was enacted specifically to scare Ms. Cotes (and Pure Aesthetics' other employees) off from complaining about low wages and incorrect paychecks.

**PURE AESTHETICS GOES BACK ON ITS COMMITMENT TO PAY 10 PERCENT COMMISSIONS TO MS. COTES**

18.     In spring 2022, as Ms. Cotes neared the end of her internal training period and began transitioning into a role as a full-time aesthetician, Pure Aesthetics let Ms. Cotes know that she'd be paid $15.00 per hour and would receive 10 percent commission on any sale she made to

a customer, plus gratuities. This same offer was also made to Alex Hollingsworth, who had recently transitioned to an aesthetician role as well.

19.     Unfortunately, Pure Aesthetics did not adhere to its promise.

20.     Ms. Cotes' first paycheck after she moved into the aesthetician role was short. Upon review, Ms. Cotes determined that she'd only received five percent commission, despite being promised 10 percent.

21.     Ms. Cotes expressed concern to Ms. Walker that she'd been underpaid. In response, Ms. Walker moved the goal posts and replied that Pure Aesthetics would pay Ms. Cotes only five percent commission until her training ended, then would honor its prior commitment and pay her 10 percent commission thereafter.

22.     On information and belief, Pure Aesthetics made similar false promises to other employees regarding commission payments and regularly issued incorrect pay statements that did not accurately reflect commission payments or hours worked.

23.     Worse still, Ms. Cotes was told that even when an error was made on a check, Pure Aesthetics would only reissue a check that was incorrect if it was off by more than $100.00.

24.     Pure Aesthetics' decision to play fast and loose with its employees' paychecks appears to have been an ongoing deliberate strategy to enrich itself at the expense of its aestheticians.

### MS. COTES (AND OTHERS) WORK OFF THE CLOCK AND PURE AESTHETICS KNEW OR SHOULD HAVE KNOWN ABOUT IT

25.     Pure Aesthetics classified Ms. Cotes (and its other aestheticians) as non-exempt under the FLSA so they were required to receive overtime for any work performed in excess of 40 hours in one work week.

26. From Monday through Thursday, Aestheticians were typically scheduled to work from 8:00 a.m. to 7:00 p.m. Friday hours were generally from 8:00 a.m. through 4:30 p.m. Occasionally, Ms. Cotes and other aestheticians worked limited Saturday hours as well, if client needs required such.

27. During a given workday, Ms. Cotes and other aestheticians spent much of her time performing procedures, like skin care treatments, chemical peels, laser resurfacing, and a host of other beauty and skincare services.

28. These procedures could take anywhere from fifteen minutes to an hour or longer. As much as possible, clients were scheduled one after another. This meant that, in the course of a typical workday, Ms. Cotes was either preparing for or performing a procedure or was cleaning and sanitizing a work room and her equipment.

29. When not preparing for, performing, or cleaning up after performing procedures, Ms. Cotes spent what limited down time she could find either completing paperwork, reviewing inventory, managing upcoming appointments, or assisting clients with skincare purchases. Yet even after Ms. Cotes left the office, Pure Aesthetics regularly required her to perform work but failed to compensate her.

30. Clients routinely contacted Ms. Cotes by text or phone to set up appointments or change existing appointments during time when she was not on the clock.

31. Ms. Cotes also provided Ms. Blaser and others with status updates via text or phone outside of work hours as well and reviewed and responded to messages on Pure Aesthetics' Slack channel for its employees, which Pure Aesthetics expressly required employees to monitor. Ms. Cotes also used the company's Slack channel to inform management personnel that she had

completed work after hours, which should have caused management to ensure that she was paid for the uncompensated time that she was working.

32. On average, Ms. Cotes worked from four to six hours a week off-the-clock.

33. On information and belief, other employees of Pure Aesthetics have performed similar amounts of off-the-clock work, for which they were not paid.

## PURE AESTHETICS FAILED TO INCLUDE MS. COTES' COMMISSIONS IN THE CALCULATION OF THE REGULAR RATE

34. Separately, depending on client schedules and the needs of the Gainesville office, Ms. Cotes sometimes worked more than forty hours in a workweek, which entitled her to overtime compensation.

35. This need for overtime began to occur with more frequency after Ms. Cotes had completed her training and was earning 10 percent commissions on sales.

36. Even though Ms. Cotes earned 10 percent commissions on sales, her earned commissions on products sold and services she provided were not included in the calculation of her regular rate of pay.

37. Because Ms. Cotes' commission earnings were wrongly excluded from the calculation of the regular rate of pay, her overtime rate was also calculated incorrectly.

38. On information and belief, Pure Aesthetics did not include commissions earned when calculating the regular rate of pay for any of its employees working as aestheticians.

## MS. COTES RESIGNS FROM PURE AESTHETICS AND OFFERS TO WORK OUT A NOTICE PERIOD TO SMOOTH THE TRANSITION

39. As time went on, Ms. Cotes became disillusioned working for Pure Aesthetics. Her paychecks were often incorrect, and she was required to work off the clock. Worse still, Ms. Blaser deployed a toxic pink coating over her actions by casting her manipulation and gaslighting of

employees as a "caring" female-owned business. For these and other reasons, Ms. Cotes decided to move on.

40.     In early September 2024, Ms. Cotes confided in her friend and then-coworker Katie Pratt that she was going to resign.

41.     When she made the decision to resign, Ms. Cotes had appointments with clients scheduled out all the way through December 2024.

42.     On September 13, 2024, Ms. Cotes told Ms. Walker that she wished to resign her employment with Pure Aesthetics.  During that conversation, and to ensure a smooth transition, Ms. Cotes expressed her desire to honor the scheduling commitments she'd made to her clients; for that reason, Ms. Cotes asked for permission to work Pure Aesthetics through December 2024. Ms. Walker stated that she'd discuss Ms. Cotes' request with Ms. Blaser.

43.     By email later that evening, at around 8:00 p.m., Ms. Cotes was informed that Pure Aesthetics had decided to accept her resignation effective immediately. Ms. Cotes' request to work through December was denied. Ms. Cotes' employment with Pure Aesthetics ended on September 13, 2024.

44.     Less than two weeks later, on September 26, 2024, Ms. Blaser informed Ms. Cotes that Pure Aesthetics was withholding all of Ms. Cotes' final paycheck, which totaled $1,504.48, purportedly because Ms. Cotes owed Pure Aesthetics some money for continuing education courses.

45.     Based on Pure Aesthetics' decision to withhold all of Ms. Cotes' final paycheck, Ms. Cotes was not paid any money for hours worked over her final pay period, in violation of the FLSA's minimum wage provisions.

**PURE AESTHETICS MAKES BASELESS CLAIMS AND INITIATES LITIGATION TO RETALIATE AGAINST MS. COTES**

46.    Ms. Cotes subsequently retained counsel. On September 26, 2024, counsel for Ms. Cotes sent a demand letter to Pure Aesthetics detailing its failures to comply with the FLSA and made a demand to resolve Ms. Cotes' FLSA claims. Ms. Cotes also demanded that Pure Aesthetics agree to waive enforcement of an onerous restrictive covenant agreement the company required her to execute during her employment. A copy of this letter is attached as **Exhibit A**.

47.    On October 18, 2024, Pure Aesthetics responded to Ms. Cotes' letter and—for the first time—Pure Aesthetics threatened to file a lawsuit against Ms. Cotes based on alleged violations of a non-compete agreement and for "tortious interference." Pure Aesthetics also baselessly accused Ms. Cotes of 1) stealing roughly $25,000 worth of equipment; and 2) converted an Instagram account, which Pure Aesthetics asserted belonged to the company.

48.    Pure Aesthetics' efforts to paint Ms. Cotes as a thief are plainly ginned-up, false claims designed to intimidate and retaliate against Ms. Cotes. Had Pure Aesthetics conducted any investigation before levying those serious allegations, it would have discovered that Ms. Blaser knew the equipment had been missing *for roughly one year before Ms. Cotes' resignation*.   A copy of Pure Aesthetics' response letter is attached as **Exhibit B**.

49.    The same goes for the purported conversion of the Instagram account. It currently is – and always has been – Ms. Cotes' account. She started it before she began working for Pure Aesthetics and maintains it now. Any posts that mention Pure Aesthetics, moreover, only do so because Pure Aesthetics tagged itself on Ms. Cotes' posts. To the extent Pure Aesthetics no longer wishes to be tagged in those posts, Pure Aesthetics can "un-tag" itself.

50.     And, only after Ms. Cotes sent her demand letter, Pure Aesthetics threatened to enforce her non-compete agreement against her. To do so, the Company points to evidence that had been publicly available for weeks. Tellingly, Pure Aesthetics' purported newfound concerns about Ms. Cotes' activity only emerged after she sent Pure Aesthetics a letter asserting her rights under the FLSA.

51.     One week later, by email from counsel for Pure Aesthetics dated October 25, 2024, Pure Aesthetics' counsel confirmed its intention to file a lawsuit against Ms. Cotes due, in part, to the fact that she raised concerns about unpaid wages under the FLSA and stated that the Company would not be "extorted into allowing Ms. Cotes to engage in corporate espionage." Counsel explained that Pure Aesthetics specifically chose "the word extortion because [Ms. Cotes was] threatening unrelated FLSA litigation and novel NLRB litigation and the attorneys' fees associated with defending such litigation to protect Ms. Cotes from clear violations of a lawful, enforceable non-compete agreement and unlawful taking of our client's social media account."

52.     But Pure Aesthetics has the causation backwards. Ms. Cotes first sent a demand asserting her rights under the FLSA and National Labor Relations Act. Then—and only then—did Pure Aesthetics threaten to file affirmative litigation against Ms. Cotes, including baseless allegations that Ms. Cotes stole property or failed to turn over her personal social media account to Pure Aesthetics.

53.     Pure Aesthetics subsequently filed a petition to compel arbitration and indicated its intent to file claims against Ms. Cotes in arbitration.

54.     Next, by letter from Pure Aesthetics' counsel dated November 5, 2024, Pure Aesthetics again accused Ms. Cotes of civil theft and demanded almost $30,000 to resolve those

claims. Those claims were baseless, and their frivolous nature could have been easily uncovered with even a modicum of diligence.

55.     By separate correspondence also dated November 5, 2024, Pure Aesthetics explicitly admitted that it had failed to include Ms. Cotes' commission earnings in its calculation of the regular rate throughout her entire employment, in violation of the FLSA.

56.     In a ham-fisted attempt to fix this admitted failure, Pure Aesthetics purported to pay Ms. Cotes $939.86, the exact amount Pure Aesthetics believed it owed Ms. Cotes in unpaid overtime wages. But Pure Aesthetics failed to pay Ms. Cotes interest or liquidated damages associated with its FLSA violation, not to mention Ms. Cotes' attorney's fees incurred by pursuing wages owed to her. More fundamentally, though, Pure Aesthetics miscalculated what Ms. Cotes was owed in several material respects.

57.     First, Pure Aesthetics failed to correctly account for her straight time pay by using a uniform rate of hourly pay when her hourly rate of pay changed from $15.00 to $15.50 to $16.00 over her employment.

58.     Second, Pure Aesthetics multiplied her incorrectly calculated regular rate by her alleged overtime hours and multiplied that amount by 0.5. This is also wrong because Pure Aesthetics paid Cotes overtime at a straight time times 1.5 rate.

59.     These inaccuracies should have been obvious to Pure Aesthetics because her purported overtime pay does not match the overtime pay listed in the pay statements prepared by Pure Aesthetics.

60.     Thus, Pure Aesthetics' belated attempts to correct its unlawful pay practices are still deficient. Even if Ms. Cotes did not work any off-the-clock overtime, Pure Aesthetics failed to pay her $3,055.87 in overtime and an additional $3,055.87 in liquidated damages, as well as her

attorneys' fees and costs for correcting Pure Aesthetics failure to comply with the FLSA—even after being expressly put on notice regarding the methodology to correct their unlawful compensation practice.

### COUNT I: FAILURE TO PAY OVERTIME WAGES, IN VIOLATION OF THE FAIR LABOR STANDARDS ACT (29 U.S.C. § 207)

61.    Ms. Cotes restates and incorporates by reference paragraphs 1-60 of the Complaint as if fully set out herein.

62.    Pure Aesthetics is an employer that is subject to the FLSA.

63.    Ms. Cotes is an employee who is covered by the FLSA.

64.    Ms. Cotes is not exempt from the overtime provisions of the FLSA.

65.    Ms. Cotes regularly worked in excess of 40 hours per week during her employment with Pure Aesthetics.

66.    As a non-exempt employee, Ms. Cotes received an hourly wage and was eligible for overtime pay at 1.5 times her hourly wage for any hours worked over 40 in a work week.

67.    Pursuant to Pure Aesthetics' practices and its commitment to Ms. Cotes, Ms. Cotes was also paid a ten percent commission on products and services sold by Ms. Cotes

68.    Under the FLSA, commission payments must be included in the regular rate of pay for purposes of overtime calculation.

69.    In spite of this unequivocal requirement, Pure Aesthetics failed to include commissions earned by Ms. Cotes in the calculation of the regular rate of pay.

70.    Because of that failure, Pure Aesthetics failed to properly calculate Ms. Cotes' overtime rate for hours worked over 40 in a workweek.

71.    When Ms. Cotes identified this failure, Pure Aesthetics initially failed to even address it, then again attempted to underpay Ms. Cotes by improperly calculating her unpaid overtime.

72.    On information and belief, Pure Aesthetics failed to include commissions earned when calculating the regular rate of other employees as well.

73.    Pure Aesthetics' failure to provide overtime pay at the correct rate to Ms. Cotes for the hours she worked in excess of 40 in a workweek has unlawfully deprived Ms. Cotes of the overtime compensation due to her (and has unlawfully enriched Pure Aesthetics).

74.    Pure Aesthetics obviously retains counsel for employment matters and either knows or should have known of this baseline FLSA requirement.

75.    Pure Aesthetics' failure to comply with the FLSA evidences willfulness and bad faith, as well as recklessness.

76.    Pure Aesthetics' willful violations of the FLSA entitle Ms. Cotes to unpaid overtime wages, as well as an equal amount in liquidated damages, and attorney's fees and costs incurred when bringing this action.

77.    The employment records reflecting Ms. Cotes' time worked and commissions earned are, or should be, in the possession, custody, or control of Pure Aesthetics.

**COUNT II: FAILURE TO PAY OVERTIME WAGES EARNED OFF THE CLOCK, IN VIOLATION OF THE FAIR LABOR STANDARDS ACT (29 U.S.C. § 207)**

78.    Ms. Cotes restates and incorporates by reference paragraphs 1-60 of the Complaint as if fully set out herein.

79.    Pure Aesthetics is an employer that is subject to the FLSA.

80.    Ms. Cotes is an employee who is covered by the FLSA.

81.    Ms. Cotes is not exempt from the FLSA's overtime provisions.

82.    Ms. Cotes performed compensable work for Pure Aesthetics outside of her normal working hours, for which Pure Aesthetics did not compensate her.

83.    For example, Pure Aesthetics maintained an employee Slack Channel that was accessible to Ms. Cotes and other employees at all times.

84.    Pure Aesthetics sent messages to Ms. Cotes and other employees over the employee Slack Channel that were directly related to Ms. Cotes' work for Pure Aesthetics.

85.    Ms. Cotes typically reviewed these Slack Channel messages outside of her normal working hours because she was busy with clients during normal work hours.

86.    Even if she had had downtime when at work, Pure Aesthetics prohibited phone use during work time, which effectively barred Ms. Cotes from reviewing these messages during work hours.

87.    Ms. Cotes also responded to client scheduling requests both before and after normal working hours. This is because clients had Ms. Cotes' phone number and reached out to her directly to schedule with her.

88.    In addition, Ms. Cotes often was asked to respond to questions from Ms. Blaser or to provide status updates outside of working hours as well.

89.    Ms. Cotes estimates that she spent between four to six hours per week engaging in this kind of work outside of normal working hours.

90.    Ms. Cotes was not paid for the time she spent performing this compensable work off the clock, in violation of the FLSA.

91.    Pure Aesthetics set up the Slack Channel and had access to it, and therefore knew or reasonably should have known that Ms. Cotes (and others) were engaging in compensable work outside of normal working hours.

92.     Pure Aesthetics also reached out to Ms. Cotes directly outside of normal working hours and received messages from Ms. Cotes outside of normal working hours. For this reason, Pure Aesthetics knew or reasonably should have known that Ms. Cotes (and others) was responding to messages from Pure Aesthetics and clients, and therefore performing compensable work, outside of normal working hours.

93.     Pure Aesthetics' failure to pay Ms. Cotes (and others) for engaging in compensable work that Pure Aesthetics knew or should have known about has unlawfully deprived Ms. Cotes of the compensation due to her (and has unlawfully enriched Pure Aesthetics).

94.     Pure Aesthetics' willful violations of the FLSA entitle Ms. Cotes to unpaid wages, as well as an equal amount in liquidated damages, and attorney's fees and costs incurred when bringing this action.

## COUNT III: RETALIATION, IN VIOLATION OF THE FAIR LABOR STANDARDS ACT (29 U.S.C. § 215)

95.     Ms. Cotes restates and incorporates by reference paragraphs 1-60 of the Complaint as if fully set out herein.

96.     Pure Aesthetics is an employer that is subject to the FLSA.

97.     Ms. Cotes is an employee who is covered by the FLSA.

98.     Ms. Cotes engaged in protected activity when she sent a demand letter to Pure Aesthetics identifying its deficient pay practices.

99.     Ms. Cotes also engaged in protected activity when alerting Pure Aesthetics that Pure Aesthetics had failed to properly calculate her regular rate of pay.

100.    In response to Pure Aesthetics' protected activity, by letter dated October 18, 2024, Pure Aesthetics, through counsel, retaliated against Ms. Cotes when it accused Ms. Cotes of theft

and threatened, for the first time, to file a lawsuit against Ms. Cotes for tortious interference, among other claims.

101.    Pure Aesthetics also retaliated against Ms. Cotes in its October 18, 2024 letter by accusing Ms. Cotes of the theft of thousands of dollars of equipment. This accusation, made without any supporting evidence at all, is patently baseless and defamatory. Its obviously untrue nature would have been uncovered with the exercise of any amount of diligence.

102.    In case there was any doubt that Pure Aesthetics was actively retaliating against Ms. Cotes for raising concerns about the way she was paid, those doubts were erased when, by letter from counsel for Pure Aesthetics dated October 25, 2024, Pure Aesthetics confirmed that it was proceeding with litigation against Ms. Cotes over less than $10,000 because she complained about being improperly paid.

103.    Pure Aesthetics has since further retaliated against Ms. Cotes by 1) demanding nearly $30,000 from Ms. Cotes based on demonstrably false accusations of theft; and 2) seeking to institute arbitration proceedings against Ms. Cotes based on alleged contractual violations. On information and belief, moreover, Pure Aesthetics continues to retaliate against Ms. Cotes.

104.    Based on its course of conduct to date, Pure Aesthetics' purported strategy is to overwhelm Ms. Cotes with false accusations and frivolous lawsuits to force her to back down.

105.    Indeed, on information and belief, Pure Aesthetics' admittedly retaliatory actions were enacted specifically to scare Ms. Cotes away from pursuing wages to which she is entitled under the law.

106.    Pure Aesthetics' actions in pursuing this unlawful course of conduct have been willful and evidence its ongoing bad faith behavior.

107.    Pure Aesthetics' retaliatory actions, including threatening to file and actually instituting retaliatory litigation via arbitration, entitle Ms. Cotes to equitable relief, compensatory damages,  and attorneys' fees and costs.

**WHEREFORE,** Ms. Cotes demands a TRIAL BY JURY and the following relief:

a.    declare that Pure Aesthetics has violated Ms. Cotes' rights under the federal statutes listed above;

b.    permanently enjoin Pure Aesthetics from violating, in the future, Ms. Cotes' rights under the federal statutes listed above;

c.    award Ms. Cotes full wages owed;

d.    award Ms. Cotes prejudgment interest as required by law;

f.    award Ms. Cotes liquidated damages;

g.    award Ms. Cotes compensatory damages, including any economic damages and emotional distress incurred in connection with the allegations alleged in the Complaint;

g.    award Ms. Cotes reasonable attorneys' fees and expenses; and

h.    grant such additional relief as may be just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. Cotes demands a jury

trial on all issues triable by jury.

Respectfully submitted, this 7th day of January, 2025.

*s/ Alexander Meier*
Alexander Meier
Florida Bar No. 1011557
Cary Burke (pro hac vice application forthcoming)
LEE MEIER LAW FIRM
695 Pylant Street NE, Suite 105
Atlanta, Georgia 30306
Telephone: (404) 474-7628
ameier@leemeier.law
cburke@leemeier.law

**COUNSEL FOR ARIEL COTES**